**REVISED, April 23, 1998**

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**
_____

No. 96-60874
_____


AMERICAN FOREST AND PAPER ASSOCIATION,

Petitioner,

VERSUS

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

Respondent.

_____

Petition for Review of an Order of
the Environmental Protection Agency
_____
March 30, 1998

Before JONES and SMITH, Circuit Judges, and FITZWATER,[*] District
Judge.

JERRY E. SMITH, Circuit Judge:


Pursuant to the Clean Water Act ("CWA"), 33 U.S.C. § 1251
*et seq.*, the Environmental Protection Agency ("EPA") delegated to
Louisiana the responsibility for administering the Louisiana
Pollutant Discharge Elimination System ("LPDES").  In exchange for
its approval, EPA required Louisiana to consult with the Fish and
Wildlife Service ("FWS") and the National Marine Fisheries Service
("NMFS") before issuing permits.  If FWS or NMFS determines that

_____

[*] District Judge of the Northern District of Texas, sitting by designation.

the proposed permit threatens endangered species—and if Louisiana refuses to modify the permit—EPA will veto the permit under its continuing oversight authority. American Forest and Paper Association ("AF&PA") challenges this rule as exceeding EPA's authority under the CWA. Because we agree that EPA lacked statutory authority, we grant the petition for review and vacate and remand the portion of the rule that imposes the consultation requirement and declares that EPA will veto any permit to which FWS or NMFS objects.

## I.

Under the CWA, one needs a permit to discharge a pollutant. At least as an initial matter, permitting authority is vested in EPA through the National Pollutant Discharge Elimination System ("NPDES"). EPA may, however, delegate permitting authority to a state if the state demonstrates that it will comply with a list of enumerated requirements and that it will monitor and enforce the terms of the permits. *See* CWA § 402(b)(1)-(9), 33 U.S.C. § 1342(b)(1)-(9). EPA does not enjoy wide latitude in deciding whether to approve or reject a state's proposed permit program. "Unless the Administrator of EPA determines that the proposed state program does not meet [the specified] requirements, he must approve the proposal." *Save the Bay, Inc. v. EPA*, 556 F.2d 1282, 1285 (5th Cir. 1977).

EPA retains oversight authority even when it delegates permitting authority to a state. Should the agency determine that

2

a state is not complying with the CWA, it may withdraw its approval of the state program. EPA also retains oversight authority over individual permits issued under approved state programs. States are required to submit permit applications and proposed permits to EPA; the agency may veto a proposed permit if it concludes that the permit violates the CWA. *See* CWA § 402(d), 33 U.S.C. § 1342(d).

Until recently, EPA administered the permitting program in Louisiana through the NPDES. Before issuing a permit, EPA chose to consult with FWS and NMFS to ensure that endangered species would not be threatened by the discharges contemplated in the permit. When EPA announced plans to delegate the permitting program to Louisiana, environmental groups cried foul, pointing out that because the Endangered Species Act ("ESA") does not apply to the states, nothing would prevent the issuance of permits that might harm endangered species.

EPA then devised the following scheme: In exchange for approving Louisiana's program, EPA directed the Louisiana Department of Environmental Quality ("LDEQ") to submit proposed permits to FWS and NMFS for review. If the federal agencies agree that the proposed permit does not threaten endangered species, the permit may be issued. But if the federal agencies conclude that the permit *does* threaten endangered speciesSSand if LDEQ refuses to modify the permit to the agencies' satisfactionSSEPA will exercise its veto power and formally object to the permit. Louisiana consented to this arrangement, and EPA issued its final rule. *See* Approval of Application by Louisiana To Administer the National

3

Pollutant Discharge Elimination System Program, 61 Fed. Reg. 47,932 (1996).

EPA invoked CWA § 304(i), 33 U.S.C. § 1314(i), as authority for attaching this condition to its approval of Louisiana's program. That section allows EPA to promulgate guidelines "establishing the minimum procedural and other elements" for state permitting programs. The agency also pointed to ESA § 7(a)(2) as justifying its action. That section provides:

> Each Federal agency shall, in consultation with and with the assistance of the Secretary [of the Interior, Commerce, or Agriculture], insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species . . . .

16 U.S.C. § 1536(a)(2). The spirit of this general mandate is echoed in the statement of congressional purpose underlying the ESA, 16 U.S.C. § 1531(c)(1), which declares it "the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this chapter."

## II.

AF&PA did not participate in the agency proceedings belowSSa silence that EPA says precludes AF&PA from raising its objection in this court. The CWA grants the federal courts of appeals original jurisdiction over challenges to determinations regarding state permitting programs under § 402(b). Although any "interested

4

person" may seek review of EPA's permitting decisions, *see* CWA § 509 (b)(1), 33 U.S.C. § 1369(b)(1), EPA argues that a party that fails to participate during the public comment period waives its claims. The agency points to its extensive newspaper advertising as evidence that AF&PA was on notice of EPA's intent to approve Louisiana's program.

EPA has failed to identify any provision in the CWA that suggests a party's failure to comment waives its right to seek judicial review. The statute allows "any interested person" that promptly files an objection to seek review in this court. Other statutes allowing judicial review of agency decisions sweep far less broadly, requiring the petitioner to have been a party. *See, e.g.*, 28 U.S.C. § 2344 (limiting right of review to "aggrieved parties"). We see nothing in the text of the statute that warrants the narrow reading EPA urges.

Moreover, we have never held that failure to raise an objection during the public notice and comment period estops a petitioner from raising it on appeal. EPA presented the same argument to us long ago, but we rejected it, observing that "EPA has cited no authority for the proposition that an argument not raised during the comment period may not be raised on review." *City of Seabrook, Tex. v. EPA*, 659 F.2d 1349, 1360 n.17 (Former 5th Cir. Oct. 1981). In that case, EPA⸺as it does again here⸺relied on *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33 (1952), involving a challenge to an Interstate Commerce Commission action by a party that participated in a hearing and

5

could have appealed the hearing officer's decision to the Commission. We characterized EPA's reliance on *L.A. Tucker* as "badly misplaced." *City of Seabrook*, 659 F.2d at 1360 n.17.

We conclude that AF&PA's failure to participate during the public comment period does not rob this court of jurisdiction. Our decision in *City of Seabrook* remains valid:

> The rule urged by EPA would require everyone who wishes to protect himself from arbitrary agency action not only to become a faithful reader of the notices of proposed rulemaking published each day in the *Federal Register*, but a psychic able to predict the possible changes that could be made in the proposal when the rule is finally promulgated. This is a fate this court will impose on no one.

*Id*. at 1360-61 (internal footnotes omitted). Estopping AF&PA from pursuing its claims would be especially unfair in that EPA *modified* its rule. The version initially proposed did not contain the consultation requirement; that provision was added only after environmental groups demanded additional protection for endangered species. AF&PA's failure to monitor the rule's evolution throughout the public comment period does not constitute waiver.

Finally, we note that the concerns underlying the exhaustion doctrine are not implicated here. That doctrine restrains courts from ruling on objections not considered by the agency by requiring a party to exhaust its administrative remedies before pursuing judicial review. *See Unemployment Compensation Comm'n v. Aragon*, 329 U.S. 143, 155 (1946). During the public comment period, EPA was presented with detailed objections concerning the scope of

6

endangered species protection under Louisiana's proposed program.[2] (To be sure, these objections came from environmental groups seeking *expanded* protections, so it is ironic that AF&PA now seeks to preserve its claim on the basis of its opponents' complaints.) In any event, because the public comments regarding the ESA were sufficiently specific to prompt EPA to *adopt* the provision contested here, the agency cannot reasonably claim that it has been denied the opportunity to consider the issue.

### III.

Before we can reach the merits of its claim, AF&PA must demonstrate that it has standing to sue. It must first show that it has suffered an "injury in fact"SSthat is, an actual and imminent injury, not one that is merely conjectural or hypothetical. It also must show a causal connection between its injury and the complained-of conduct. Finally, it must establish that its injury is likely to be redressed by a favorable decision. *Bennett v. Spear*, 117 S. Ct. 1154, 1163 (1997). EPA claims that AF&PA cannot meet any of these requirements.

### A.

AF&PA's members include permit holders in Louisiana. Although AF&PA has not alleged that any of its members has applied for a new permit or sought to modify an existing one, it argues that injury

---

[2] For example, an environmental group from Tulane Law School specifically charged that "the Endangered Species Act will become unavailable to citizens if [the Louisiana] DEQ becomes the administrator of the NPDES program."

is imminent, in the form of costs of compliance with EPA's new rule, including delays in permitting and the added risk that an application will be denied. EPA says AF&PA's alleged injury is purely hypothetical, because it rests on a chain of speculation. In EPA's view, this chain is linked by a series of dubious assumptions about the circumstances under which EPA might exercise its veto power.

We do not find the permit holders' injuries speculative. As an initial matter, permits are not eternal: They must be renewed every five years. Modifications to existing permits must also be cleared with FWS and NMFS. Moreover, EPA has already identified the circumstances under which it will veto a proposed permit. *See* 61 Fed. Reg. at 47,934 ("EPA *will* formally object to the issuance of the draft permit if FWS determines that the action is likely to jeopardize the continued existence of a listed or proposed species or destroy designated critical habitat.") (emphasis added). Permit holders' imminent need to comply, coupled with EPA's frank announcement of its intentions, belies the agency's claim that any injury is speculative.[3]

B.

EPA next launches a redressability challenge, contending that Louisiana's voluntary commitment to cooperate with the federal agencies would withstand a court decision striking down the rule's

---

[3] EPA's claim that AF&PA has not shown causationSSa link between the agency's decision and the permit holders' injury-in-factSSis also premised on the allegedly speculative nature of the injury. It fails for the same reason.

consultation requirement. EPA correctly points out that Louisiana is free to consult with FWS and NMFS in making permitting decisions. But this argument misses the real question: whether EPA may promulgate a rule *requiring* Louisiana to obtain the federal government's blessing before issuing a permit. In this instance, a permissible end does not validate impermissible means. EPA's redressability challenge, accordingly, is meritless.

IV.

The final threshold issue is ripeness. In determining whether an issue is ripe for review, we must balance the fitness of the issues for judicial decision with the hardship to the parties of withholding review. *Chevron U.S.A., Inc. v. Traillour Oil Co.*, 987 F.2d 1138, 1153-54 (5th Cir. 1993) ("[T]he ripeness inquiry focuses on whether an injury that has not yet occurred is sufficiently likely to happen to justify judicial intervention."). Ordinarily we wait until a rule has been applied before granting review; this prudential concern loses force, however, when the question presented is purely legal. *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 833 F.2d 583, 587 (5th Cir. 1987).

The instant case concerns a purely legal issue: whether EPA enjoys the statutory authority to require Louisiana, before it may issue a discharge permit, to consult with federal agencies regarding the impact on endangered species. Contrary to EPA's assertion, there are no facts awaiting development that would aid

9

our decision; to the extent any factual questions even exist, they are overshadowed by the legal question that towers over this case. Because deferring review will impose an immediate, significant burden on the petitionerSSand because we are confronted with a pure question of lawSSthis dispute is ripe for review.

## V.

EPA contends that its rule is authorized by CWA § 304(i), 33 U.S.C. § 1314(i), which directs EPA to promulgate guidelines governing state permitting programs under CWA § 402(b), 33 U.S.C. § 1342(b). EPA also suggests that its decision is not only authorized but compelled by ESA § 7(a)(2), 16 U.S.C. § 1536(a)(2). That section directs federal agencies to consult with FWS and NMFS before undertaking any "agency action," to ensure that the action will not threaten an endangered species.

## A.

We review EPA's interpretation of the CWA in two steps. *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 867 (1984). We first ask whether Congress has directly spoken to the precise question at issue. If so, we must defer to the clearly expressed congressional intent. If notSSif the statute is silent or ambiguousSSwe ask whether the agency's interpretation is based on a permissible construction of the statute. *Id*. at 842-43. We do not, however, accord *Chevron* deference to EPA's interpretation of the ESA, because the ESA is not a statute that EPA is charged

10

with administering.  *See Adams Fruit Co. v. Barrett*, 494 U.S. 638, 649-50 (1990).


B.

Specifically, CWA § 402(b), 33 U.S.C. § 1342(b), provides that the EPA Administrator "shall approve" proposed state permitting programs that meet nine specified requirements.  The key question is whether EPA may deny a state's proposed program based on a criterionSSthe protection of endangered speciesSSthat is not enumerated in § 402(b).

EPA calls our attention to CWA § 304(i), 33 U.S.C. § 1314(i), construing that section as authorizing the agency to regard the nine requirements § 402(b) as minimum, not exhaustive, criteria.[4] EPA further contends that because nothing in § 402(b) *prohibits* EPA from adding additional criteria, its interpretation of the statute is reasonable and worthy of deference under *Chevron*.

We cannot agree.  The language of § 402(b) is firm:  It provides that EPA "shall" approve submitted programs unless they fail to meet one of the nine listed requirements.  We interpreted this language as non-discretionary in *Save the Bay, Inc. v. EPA*, 556 F.2d 1282 (5th Cir. 1977), noting that "[t]he Amendments [to the CWA] set out the full list of requirements a state program must meet . . . .  Unless the Administrator of EPA determines that the

---

[4] Section 304(i) provides: "The Administrator shall . . . promulgate guidelines establishing the minimum procedural and other elements of any State program under Section 1342 of this title which shall include . . . monitoring requirements . . . reporting requirements . . . enforcement provisions; and . . . funding, personnel qualifications, and manpower requirements . . . ."

11

proposed state program does not meet these requirements, he must approve the proposal." *Id*. at 1285 & n.3. *See also Natural Resources Defense Council v. EPA*, 859 F.2d 156, 174 (D.C. Cir. 1988); *Citizens for a Better Env't v. EPA*, 596 F.2d 720, 722 (7th Cir. 1979).

EPA's claim is further weakened by CWA § 402(b)(6), 33 U.S.C. § 1342(b)(6), which grants EPA veto power over a proposed permit if the Secretary of the Army concludes that the discharges contemplated by the permit would substantially impair anchorage and navigation. Congress could have, but did not, grant EPA an analogous veto power to protect endangered species.

Nothing in § 304(i) undermines this conclusion. That subsection simply directs EPA to issue regulations governing the approval process for state programs. There is no hint that Congress intended to grant EPA authority to erect additional hurdles to the permitting process beyond those expressly noted in § 402(b). Moreover, neither section even mentions endangered species or the ESA.[5] The statute's plain language directs EPA to approve proposed state programs that meet the enumerated criteria; particularly in light of the command "shall approve," § 304(i) cannot be construed to allow EPA to expand the list of permitting requirements. Applying *Chevron*, we conclude that Congress *has* spoken directly to the precise question at issue: EPA's discretion lies not in modifying the list of enumerated criteria, but simply

---

[5] EPA's own regulations identifying the grounds on which the agency might object to state permits are similarly silent: They make no mention of protection of endangered species. *See* 40 C.F.R. § 123.44(c).

12

in ensuring that those criteria are met.

C.

In *American Iron & Steel Inst. v. EPA*, 115 F.3d 979 (D.C. Cir. 1997) ("*AISI*"), the court concluded that EPA may require states to include provisions in certain permitting programs to ensure the protection of endangered species.  EPA argues that *AISI*'s logic is applicable to the instant case.

*AISI* is distinguishable, however, in that the case arose under a different provision of the CWASS§ 118(c)(2), 33 U.S.C. § 1268(c)(2).  That section directs EPA to promulgate "water quality guidance" for the Great Lakes.  But § 118(c)(2) is structured quite differently from § 402:  The former grants EPA authority to specify pollutant limits for the Great Lakes and develop "guidances" to which state programs must conform; the section does not direct the agency to approve state programs that meet certain requirements.

In addition to this far broader grant of authority, § 118(c)(2) specifically mentions that EPA's development of pollutant limits should aim to protect aquatic life and wildlife in the Great Lakes.  The *AISI* court relied on this language in concluding that EPA did not exceed its statutory authority under § 118(c):

> We uphold this portion of the Guidance, but not because of the ESA.  Section 118(c)(2) provides that the Guidance "shall specify numerical limits on pollutants in ambient Great Lakes waters to protect human health, *aquatic life, and wildlife*, and shall provide guidance to the Great Lakes States on minimum water quality standards . . . ."

13

(emphasis added)  This is all the authority the EPA needed to promulgate regulations designed to protect endangered, threatened and other species in the Great Lakes System.

115 F.3d at 1003.  *AISI*'s reasoning, insofar as it concerns a section of the CWA that materially differs in language and purpose, is inapplicable here.


D.

Finally, EPA argues that ESA § 7(a)(2), when construed alongside the Court's broad reading of the statute in *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 173 (1978), compels EPA to do everything reasonably within its power to protect endangered species.  The flaw in this argument is that if EPA lacks the power to add additional criteria to CWA § 402(b), nothing in the ESA grants the agency the authority to do so.  Section 7 of the ESA merely requires EPA to consult with FWS or NMFS before undertaking agency action; it confers no substantive powers.[6]

The District of Columbia Circuit construed ESA § 7(a)(2) in *Platte River Whooping Crane Trust v. Federal Energy Regulatory Comm'n*, 962 F.2d 27 (D.C. Cir. 1992), holding that the statute "does not expand the powers conferred on an agency by its enabling act," but rather directs the agencies to "utilize" their existing powers to protect endangered species.  *Id*. at 34.  In that case,

---

[6] Whether EPA's approval of Louisiana's permitting program constitutes "agency action" for ESA purposes is largely beside the point.  Even if EPA were required to consult with the agencies before approving Louisiana's program, EPA lacks authority to modify the plain language of the CWA by adding to the list of enumerated requirements.

14

the petitioner, Whooping Crane Trust, pressed virtually the same argument EPA advances here.  The court observed:

> The Trust reads section 7 essentially to oblige the [Federal Energy Regulatory Commission] to do "whatever it takes" to protect the threatened and endangered species that inhabit the Platte River basin; any limitations on FERC's authority contained in the [Federal Power Act] are implicitly superseded by this general command. . . . We think the Trust's interpretation of the ESA is far-fetched.

*Id*.  We agree that the ESA serves not as a font of new authority, but as something far more modest:  a directive to agencies to channel their *existing* authority in a particular direction.  The upshot is that EPA cannot invoke the ESA as a means of creating and imposing requirements that are not authorized by the CWA.

Accordingly, we GRANT the petition for review and VACATE the portion of the rule that imposes the consultation requirement and declares that EPA will reject any proposed permit to which FWS or NMFS objects.  This matter is REMANDED to the EPA for further appropriate proceedings.[7]

---

[7] The Motion of Amici Curiae for Clarification or Partial Reconsideration is denied as moot.