**PUBLISH**

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 1 1998**

**PATRICK FISHER**
**Clerk**

AMERICAN FOREST & PAPER
ASSOCIATION,

        Petitioner,

v.

UNITED STATES
ENVIRONMENTAL PROTECTION
AGENCY; JANE N. SAGINAW,
Regional Administrator, United States
Environmental Protection Agency,
Region 6,

        Respondents,

--------------------------------

AMERICAN PETROLEUM
INSTITUTE, AMERICAN WOOD
PRESERVERS INSTITUTE,
CHAMBER OF COMMERCE OF
THE UNITED STATES
INDEPENDENT PETROLEUM
ASSOCIATION OF AMERICA,
MICHIGAN MANUFACTURERS

97-9506

ASSOCIATION, NATIONAL
ASSOCIATION OF HOME
BUILDERS, NATIONAL
ASSOCIATION OF
MANUFACTURERS, THE STATE
CHAMBER, OKLAHOMA'S
ASSOCIATION OF BUSINESS AND
INDUSTRY,

    Amici Curiae.

---

## ON PETITION FOR REVIEW OF FINAL AGENCY ACTION
## BY THE ENVIRONMENTAL PROTECTION AGENCY

---

Russell S. Frye, of Chadbourne & Parke, LLP, Washington, D.C. (Erin Buckley Bradley, Chadbourne & Parke, LLP, and Cynthia H. Evans of American Forest & Paper Association, Inc., Washington, D.C., with him on the briefs) for Petitioner.

Alan D. Greenberg, Attorney, U.S. Department of Justice, Environment & Natural Resources Division, Denver, Colorado (Lois J. Schiffer, Assistant Attorney General, U.S. Department of Justice, Environment & Natural Resources Division, Denver, Colorado, and Steven Neugeboren and Thomas S. Marshall, U. S. Environmental Protection Agency, Washington, D.C., with him on the brief) for Respondents.

Scott M. DuBoff, John W. Heiderscheit III, Wright & Talisman, P.C., Washington, D.C., Counsel for Amici Curiae, Alice Crowe, Washington, D.C., on the brief for American Petroleum Institute, Robin S. Conrad, National Chamber Litigation Center, Inc., Washington, D.C., on the brief for Chamber of Commerce of the United States, David M. Sweet, Washington, D.C., on the brief for Independent Petroleum Association of America, J. Walker Henry, Clark, Hill P.L.C, Detroit, Michigan, on the brief for Michigan Manufacturers Association, Alec Ugol, Washington, D. C., on the brief for National Association of Home Builders, Jan Amundson, Washington, D. C., on the brief for National Association of Manufacturers, and James R. Barnett, Kerr, Irvine, Rhodes & Ables, Oklahoma City, Oklahoma, on the brief for The State Chamber, Oklahoma's Association of Business and Industry, submitted an Amici Curiae brief in support of Petitioner.

Before **SEYMOUR,** Chief Judge, **McWILLIAMS** and **MURPHY,** Circuit Judges

**MURPHY,** Circuit Judge.

American Forest and Paper Association (Association) brought this action challenging the Environmental Protection Agency's (EPA) approval of the Oklahoma Pollutant Discharge Elimination System permit program. The Association specifically challenges that portion of the permit program relating to the consultation procedures between the State of Oklahoma and the United States Fish and Wildlife Service to ensure compliance with the Endangered Species Act. Because this court concludes the Association lacks constitutional standing, we dismiss their claims.

## I. BACKGROUND

Congress passed the Clean Water Act (Act) in an effort "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). In furtherance of these goals, § 301(a) of the Act makes it unlawful to discharge any pollutant into navigable waters unless specifically authorized by the Act. *See id.* § 1311(a). Section 402 of the Act establishes the National Pollutant Discharge Elimination System (NPDES). *See id.* § 1342.

Under the NPDES, the Administrator of the EPA has authority to issue permits for the discharge of pollutants. *See id.* § 1342(a).

Although Congress granted the EPA initial authority to issue NPDES permits, it intended that the states would eventually assume primary responsibility over the NPDES program. *See id.* § 1251(b). Section 402(b) of the Act thus provides that each state may establish and administer its own permit program, subject to approval and oversight by the EPA. *See id.* § 1342(b). So long as a proposed state permit program satisfies several enumerated conditions, the EPA must approve the program. *See id.* The EPA retains oversight authority over state permit programs and may withdraw its approval of a particular program if it determines the state is not complying with the Act. *See id.* § 1342(c)(3). The EPA further retains oversight authority over individual permits issued by a state and may veto a proposed permit if it determines the permit would violate the Act. *See id.* § 1342(d).

In 1994, the state of Oklahoma sought approval from the EPA to establish and administer its own NPDES permit program. The EPA and the Oklahoma Department of Environmental Quality (ODEQ) agreed to a procedure whereby ODEQ and the Fish and Wildlife Service (Service) would work together on permit applications to ensure compliance with the Endangered Species Act (ESA). This consultation procedure is reflected in a Memorandum of Understanding (MOU)

and a Memorandum of Agreement,[1] both of which are incorporated by reference into the final rule approving Oklahoma's permit program. *See* 61 Fed. Reg. 65,047, 65,053 (1996).

The MOU was entered into between ODEQ and the Service in March 1995. *See* Oklahoma Dep't of Envtl. Quality & U.S. Fish and Wildlife Serv., Memorandum of Understanding (1995) [hereinafter "MOU"]. Under the MOU, the Service agreed to provide to ODEQ on an annual basis various information relating to "federally listed threatened, endangered and proposed [species], as well as designated or proposed critical habitat, that occur in Oklahoma and that are dependent upon aquatic habitats for their existence." *Id.* at 1. ODEQ agreed to use the information provided by the Service to identify "sensitive waters" in the state. *Id.*

The MOU further provides that "[w]hen a new NPDES permit application, or an application for a modification of an existing permit, is received by [O]DEQ for a sensitive water," ODEQ will submit various specified information to the Service.[2] *Id.* Within thirty days after submitting the information to the Service,

---

[1]The Memorandum of Agreement between ODEQ and the EPA essentially adopts the procedures specified in the MOU. *See* Memorandum of Agreement Between Oklahoma Dep't of Envtl. Quality & U.S. EPA (Region 6) at 26-27 (June 7, 1996).

[2]Specifically, ODEQ must submit the following information to the Service: (1) the facility name; (2) the location, including county and legal

(continued...)

ODEQ must inform the Service of its initial determination as to "whether the proposed permit 'is not likely to adversely affect' or 'may affect' a federally-listed species, designated critical habitat, jeopardize a proposed species, or adversely modify or destroy a proposed critical habitat." *Id.* If the Service disagrees with ODEQ's initial determination, it must inform ODEQ of its nonconcurrence. *See id.* If either the Service or ODEQ determines that a proposed permit is likely to have an adverse effect on a species or habitat, then ODEQ and the Service will "work together to modify the permit application to avoid the adverse effect." *Id.* at 2. At this point in the consultation process, additional information may be requested of the permit applicant. *See id.*

If the Service and ODEQ are unable to reach agreement on modifications to the permit application to avoid the adverse effect on species or habitat, the MOU requires ODEQ to notify the EPA. *See id.* The EPA may make a formal objection to the permit application if either the Service or ODEQ determines that the proposed action "may adversely affect listed species or critical habitat." *Id.* The EPA is required to formally object to the permit application and assume

---

[2](...continued)
description; (3) the receiving waters to be affected by the permitted activity; (4) the standard industrial classification of the permit, describing the type of facility and discharge expected; and (5) available data on the physical, chemical, and biological characteristics of the receiving waters.
MOU at 1.

permitting authority if the Service determines the proposed action is "likely to jeopardize the continued existence of a listed or proposed species or destroy or adversely modify designated or proposed critical habitat." *Id.* If the EPA assumes permitting authority, it must then consult with the Service, in accordance with § 7(a) of the ESA,[3] to ensure compliance with the ESA. *See id.*

With respect to renewals of existing permits,[4] the MOU requires ODEQ to submit to the Service on an annual basis a list of permits which ODEQ expects will be resubmitted for renewal the following year. *See id.* If an anticipated application for renewal appears to affect "sensitive water" as identified by the Service, the Service may request additional information on that permit. *See id.*

The Association challenges the EPA's approval of Oklahoma's NPDES permit program, arguing that the EPA acted outside its authority by requiring Oklahoma to comply with the ESA through the consultation process with the Service. The EPA contends that the Association lacks standing to bring this

---

[3]Section 7(a) of the ESA requires federal agencies to consult with the Secretary of the Interior, Commerce, or Agriculture to ensure that any action "authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined . . . to be critical." 16 U.S.C. § 1536(a)(2).

[4]The Act provides that NPDES permits may not be issued for longer than five years. *See* 33 U.S.C. § 1342(b)(1)(B).

action; that this action is not yet ripe for review; and that it acted within its authority in developing procedures to facilitate compliance with the ESA.

## II. STANDING

Before addressing the merits of the Association's challenge to the EPA's approval of Oklahoma's NPDES permit program, this court must first determine whether the Association has standing to bring its claims. The Association brought this action under § 509(b) of the Clean Water Act, which grants the federal courts of appeals original jurisdiction over determinations by the EPA regarding a state NPDES permit program. *See* 33 U.S.C. § 1369(b)(1)(D). The Act provides that "any interested person" may bring suit to challenge the EPA's determination.[5] *Id.* § 1369(b)(1).

The Association is a "nonprofit trade association whose member companies grow, harvest, and process wood and wood fiber, and manufacture pulp, paper, and paperboard products and solid wood products." Its "general nature and purpose is to provide a forum for sharing ideas and information, and to represent the interests of its members in legislative and regulatory matters." In its statement of subject matter jurisdiction, required by Federal Rule of Appellate Procedure 28(a)(2), the Association states that its "members include NPDES

---

[5]Application for review must be made within 90 days from the date of the EPA's action which is the subject of the challenge. *See* 33 U.S.C. § 1369(b)(1).

permit holders in Oklahoma." There is no other information in the record concerning the Association's membership.

Although § 509(b) of the Act broadly provides that "any interested person" may challenge the EPA's approval of a state NPDES permit program, a plaintiff must nevertheless satisfy the standing requirements of Article III of the U.S. Constitution to bring such an action. *See Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 487 n.24 (1982) (stating that congressional enactment may not lower threshold requirements of standing under Article III); *Montgomery Envtl. Coalition v. Costle*, 646 F.2d 568, 577-78 (D.C. Cir. 1980) (stating that § 509(b) of the Clean Water Act incorporates injury-in-fact rule for standing); *cf. Public Interest Research Group v. Magnesium Elektron, Inc.*, 123 F.3d 111, 119 (3d Cir. 1997) ("Congress' power to authorize citizen suits [under the Clean Water Act] and draft citizens as private attorneys general is inherently limited by the 'case or controversy' clause of Article III of the Constitution.").

Article III restricts federal court adjudication to actual cases or controversies. *See Allen v. Wright*, 468 U.S. 737, 750 (1984). To satisfy the standing requirement of Article III, the Association must demonstrate the following:

> (1) that [it has] suffered an "injury in fact"--an invasion of a
> judicially cognizable interest which is (a) concrete and particularized

and (b) actual or imminent, not conjectural or hypothetical; (2) that there [is] a causal connection between the injury and the conduct complained of--the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) that it [is] likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Bennett v. Spear*, 117 S. Ct. 1154, 1163 (1997). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

An association has standing to bring suit on behalf of its members if "'(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 553 (1996) (quoting *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)). The Supreme Court has recently recognized that the first requirement of associational standing embodies the Article III requirements of injury in fact, causal connection to the defendant's conduct, and redressability. *See id.* at 555.

The EPA argues the Association lacks constitutional standing because its members cannot show an imminent, concrete injury from the EPA's approval of Oklahoma's NPDES permit program. The Association, whose members include

-10-

current NPDES permit holders in Oklahoma, contends its members are injured by the consultation procedures contained in Oklahoma's permit program because of the increased costs and delays in processing permits and because of the threat of veto by the EPA. [6] The Association asserts that under the procedures set forth in the MOU, all modifications and renewals of existing permits are subject to consultation with the Service, thereby resulting in significant costs and delays. Further, according to the Association, under the procedures the EPA is required to veto any permit if the Service objects based on ESA grounds, thus increasing the likelihood that permit applications will not be approved.

The Association overstates the scope of the consultation procedures. Under the MOU, all permit applications will not go through the consultation process. Rather, only those permits that may affect "sensitive waters" are subject to the process. *See* MOU at 1 (stating that "[w]hen a new NPDES permit application, or an application for a modification of an existing permit, is received by [O]DEQ *for a sensitive water*," ODEQ will submit various information to the Service (emphasis added)); *id.* at 2 ("If an anticipated application for renewal *appears to*

---

[6]The Association has not asserted that as an organization it has been injured by the EPA's approval of Oklahoma's NPDES permit program. *Cf. Warth v. Seldin*, 422 U.S. 490, 511 (1975) (noting that an "association may have standing solely as the representative of its members" or "in its own right to seek judicial relief from injury to itself").

*be located in a sensitive water* identified by the Service, the Service can request additional information on that permit." (emphasis added)).

Although the Association has asserted that its members include current NPDES permit holders in Oklahoma, it has not alleged that any of its members hold permits to discharge into sensitive waters nor has it alleged that any of its members intend to apply for such a permit. [7] During oral argument, counsel for the Association suggested it could be inferred that at least one of its members currently holds a permit to discharge into sensitive waters based on its allegation that its members will be adversely affected by the consultation procedures. We decline to make such an inference. "It is a long-settled principle that standing cannot be inferred argumentatively from [the party's] averments . . . but rather must affirmatively appear in the record." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (internal quotations and citations omitted); *see also Warth v. Seldin*, 422 U.S. 490, 518 (1975) ("It is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers.").

---

[7]When asked specifically during oral argument whether there was anything in the record indicating that any of the Association's members held permits to discharge into sensitive waters, counsel for the Association responded in the negative.

Even assuming the Association's assertions of injury are sufficiently concrete and imminent to satisfy Article III, absent an allegation that its members currently discharge or intend to discharge into sensitive waters, the Association cannot demonstrate that its members are themselves "among the injured." *Lujan*, 504 U.S. at 563 ("'[T]he "injury in fact" test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured.'" (quoting *Sierra Club v. Morton*, 405 U.S. 727, 734-35 (1972)). This court therefore concludes the Association lacks standing to pursue this action.[8] *Cf. Sierra Club v. Morton*, 405 U.S. 727, 735 (1972) (holding

---

[8]After oral argument was heard in this case, the Fifth Circuit in *American Forest & Paper Ass'n v. United States Environmental Protection Agency*, 137 F.3d 291 (5th Cir. 1998), held that the Association had standing to challenge the EPA's approval of Louisiana's NPDES permit program. *See id.* at 296. The court further concluded that the dispute was ripe for review and that the EPA exceeded its authority by conditioning its approval of Louisiana's permit program on the state's compliance with the ESA. *See id.* at 297-99. In holding that the Association had standing to pursue its claims, the court rejected the EPA's argument that the permit holders' injuries were speculative. *See id.* at 296. The court concluded that the "[p]ermit holders' imminent need to comply, coupled with EPA's frank announcement of its intentions [i.e., the EPA's identification of the circumstances in which it will veto a proposed permit], belies the agency's claim that any injury is speculative." *Id.*

It is unclear, however, whether the specific consultation procedures at issue in the Fifth Circuit case are the same as the relevant procedures in this case. When discussing Louisiana's permit program, the court summarily stated that the "EPA directed the Louisiana Department of Environmental Quality ('LDEQ') to submit proposed permits to [the Fish and Wildlife Service] and [the National Marine Fisheries Service] for review." *Id.* at 294. The court did not discuss whether all permit applications or only those applications affecting sensitive

(continued...)

environmental group lacked standing to challenge Forest Service permit allowing development in national forest because "[n]owhere in the pleadings or affidavits did [plaintiff] state that its members use [the forest] for any purpose"); *Public Interest Research Group*, 123 F.3d at 123 (holding public interest group and its members lacked standing to challenge manufacturer's alleged violations of NPDES permit because neither group nor members could show injury from violations).

## III. CONCLUSION

This court concludes the Association lacks standing to pursue this action. We therefore **DISMISS** their claims.

---

[8](...continued)
waters must be routed through the consultation process.  In fact, the term "sensitive water" does not even appear in the Fifth Circuit's opinion.  The EPA's final approval of Louisiana's application to administer its own NPDES program, published in the Federal Register, also does not specify the exact procedures to be followed nor does it mention the term "sensitive water." *See* 61 Fed. Reg. 47,932 (1996).  Rather, like the EPA's approval of Oklahoma's permit program, the EPA's approval of Louisiana's program incorporates only by reference the memorandum of understanding between the state and the Service. *See id.* at 47,934.