STATE OF MAINE

KENNEBEC, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. AP-03-43

UNITED STATES PUBLIC INTEREST
RESEARCH GROUP, *et al.*,

      Petitioners

   v.

THE BOARD OF ENVIRONMENTAL
PROTECTION,

      Respondent

**DECISION AND ORDER**

SEP 15 2004

This matter is before the court on petition pursuant to M.R. Civ. P. 80C and

M.R.S.A. § 11001 *et seq.* Petitioners United States Public Interest Research Group (U.S.

PIRG), the Sierra Club, The Conservation Law Foundation, Inc. (CLF) and two of its

members, Charles Fitzgerald, and Stephen Crawford filed a petition for review of final

agency action. Atlantic Salmon of Maine was granted intervention as a party-

respondent and Stolt Sea Farm, International AquaFoods, USA, Inc., and D.E. Salmon

Inc., filed their written appearance.

Dated June 19, 2003, the Maine Board of Environmental Protection (BEP)

approved a Maine Pollutant Discharge Elimination System Permit and Waste Discharge

License approving the issuance of a general permit for certain Atlantic Salmon

Aquaculture Facility[1] in Class SB or SC Waters of the State located east of Naskeag Point

in Brooklin, except those waters in the area North of a line from Schoodic Point in

Winter Harbor to Baker Island in Cranberry Island, then West to Naskeag Point in

Brooklin, subject to conditions and all applicable standards and regulations.

---

[1] This permit is not issued to a particular applicant but to those practicing this type of fish farming
generally.

Petitioners seek review of the permit issued pursuant to the Federal Clean Water Act, 33 U.S.C. § 1251 *et seq.*, by the BEP. Asserting that salmon farms discharge numerous pollutants including chemical pesticides, antibiotics, tons of uneaten food and fish wastes, dyes and the fish themselves[2] into navigable waters, petitioners challenge the procedure and substantial evidence supporting issuance of a general permit.

For some years the interested parties have owned and operated salmon farms in the waters of the State of Maine pursuant to Maine Department of Marine Resources (DMR) aquaculture leases. Initially told by the United States Environmental Protection Agency (EPA) that they were not required to obtain a permit under the National Pollutant Discharge Elimination System (NPDES), in 1989 and 1990 they were then told that such permits were required and to submit an application to the EPA. The applications were appropriately filed but the salmon farmers never received any permits nor did they receive any response from the EPA regarding any of their applications. During those years, the EPA was the only NPDES permitting agency. However, in January of 2001, the EPA delegated to the State of Maine the authority to issue permits under the NPDES, memorialized by a memorandum of agreement between the Maine Department of Environmental Protection (DEP) and the EPA dated January 12, 2001.

Beginning in September of 2002, the BEP, at the behest of the DEP, assumed jurisdiction over the issuance of a general finfish aquaculture permit. Beginning in December of 2002 with prehearing conferences, and continuing through public meetings held by BEP in Bangor and Machias and elsewhere, 1,400 pages of testimony,

---

[2] The farm bred salmon, often European strains not native to Maine waters, are themselves considered, in a sense, a pollutant in this case.

additional exhibits, the application and agency memoranda created an administrative record approaching 4,000 pages. The permit itself (MEG130000), with appendixes is 110 pages long.

In petitioners' reply brief, they included a "declaration" by Joshua R. Kratka referring to an attached list of additives fed to farmed salmon and chemicals used in the sea pen operations. Upon motion by the respondent, the court has stricken the "declaration" as an improper attempt to expand the record for review by the court.

When the decision of an administrative agency is appealed pursuant to M.R. Civ. P. 80C, this Court reviews the agency's decision directly for abuse of discretion, errors of law, or findings not supported by the evidence. *Centamore v. Dep't of Human Services*, 664 A.2d 369, 370 (Me. 1995). "An administrative decision will be sustained if, on the basis of the entire record before it, the agency could have fairly and reasonably found the facts as it did." *Seider v. Board of Exam'r of Psychologists*, 2000 ME 206 ¶ 9, 762 A.2d 551, 555 (Me. 2000) (citing *CWCO, Inc. v. Superintendent of Ins.*, 1997 ME 226, ¶ 6, 703 A.2d 1258, 1261 (Me. 1997)).

In reviewing the decisions of an administrative agency, the Court should "not attempt to second-guess the agency on matters falling within its realm of expertise" and the Court's review is limited to "determining whether the agency's conclusions are unreasonable, unjust or unlawful in light of the record." *Imagineering v. Superintendent of Ins.*, 593 A.2d 1050, 1053 (Me. 1991). The focus on appeal is not whether the Court would have reached the same conclusion as the agency, but whether the record contains competent and substantial evidence that supports the result reached by the agency. *CWCO, Inc. v. Superintendent of Ins.*, 703 A.2d 1258, 1261. "Inconsistent evidence will not render an agency decision unsupported." *Seider*, 762 A.2d 551 (citations omitted). The

burden of proof rests with the party seeking to overturn the agency's decision, and that party must prove that no competent evidence supports the Board's decision. *Id.*

Factual determinations must be sustained unless shown to be clearly erroneous. *Imagineering*, 593 A.2d at 1053 (noting that the Court recognizes no distinction between the clearly erroneous and substantial evidence in the record standards of review for factual determinations made by administrative agencies). "A party seeking review of an agency's findings must prove they are unsupported by *any* competent evidence." *Maine Bankers Ass'n v. Bureau*, 684 A.2d 1304, 1306 (Me. 1996) (emphasis added).

"When the dispute involves an agency's interpretation of a statute administered by it, the agency's interpretation, although not conclusive on the Court, is accorded great deference and will be upheld unless the statute plainly compels a contrary result." *Maine Bankers Ass'n*, 684 A.2d at 1306 (citing *Centamore v. Department of Human Services*, 664 A.2d 369, 370 (Me. 1995).

Petitioners advance four principal arguments in favor of their petition seeking reversal and remand or modification of the June 19, 2003 BEP decision to issue a general permit for Atlantic Salmon Aquaculture.

1.     The BEP decision to issue a general permit is unsupported by substantial evidence and constitutes an error of law.

2.     The BEP decision allowing "mixing zones" for sediment beneath salmon farms is in excess of statutory authority.

3.     The permit conditions are less protective of Wild Salmon than those required by federal wildlife agencies and therefore violate state law.

4.     The BEP ruling that DEP would serve as both "applicant" and BEP staff during the hearings created a biased process and violate BEP regulations.

Petitioners assert that Maine law authorizes issuance of general permits instead of individual permits for pollution sources that have the same type of discharge, but only if that discharge involves "a relatively low risk for significant environmental impact." Code Me. R. 06-096-529 (Summary). Petitioners aver that BEP did not find that salmon farm discharges pose a low risk for environmental impact. Specifically, petitioners note that BEP acknowledged the pollution potential of the fish themselves as a genetic pollutant putting Wild Salmon at further risk of extinction through escape and interbreeding. *See* Administrative Record at page 92 ¶ ("To protect wild Atlantic Salmon . . . the genetic composition of commercially raised fish is a factor that must be considered . . . to the extent different genetic composition between commercial and wild fish may affect restoration efforts, the risk from genetically different commercial fish may be substantial.").

Petitioners argue that BEP has sidestepped the prohibition on issuance of general permits where there is a heightened risk to the environment by considering the risk of the activity (salmon farming) as regulated, "not as it may have performed in the past." Petitioners argue that BEP's interpretation of the regulation permitting it to consider the risk posed by an activity or industry "as regulated" is absolutely counter to the intent of the regulation's goal of assessing risk, as it exists before issuing a permit. Citing Code Me. R. 06-096-529 § 2(b)(3)(i)(G) (whether "[t]he discharge(s) is a significant contributor of pollutants.") and *Id.* at § 3(e)(3) ("A discharge covered by a General Permit may not . . . contain any pollutant, including toxic substances, in quantities or concentrations which may cause or contribute to any adverse impact on the receiving water . . .").

Respondent argues that BEP as the agency selected by the legislature to carry out enforcement of the State's water quality laws is expected to have the expertise for this task. Respondent asserts that courts must defer to an agency's expertise in setting

policy. Citing *Conservation Law Foundation, et al. v. DEP*, 2003 ME 62, ¶31, 823 A.2d 551, 561 (Me. 2003) ("When an agency utilizes its expertise in setting policy, as long as it does not contravene its statutory authority, we defer to its policy determinations.").

Intervenor Atlantic Salmon of Maine, LLC, (ASM) finds support for the BEP's actions in the relevant regulation:

(a) Coverage. The Department may issue a general permit in accordance with the following:

Code Me. R. 06-096-529 § 2(a)

(A) Involve the same or substantially similar types of operations;

(B) Discharge the same types of wastes;

(C) Require the same effluent limitations or operating conditions;

(D) Require the same or similar monitoring; and

(E) **In the opinion of the Department** (emphasis supplied), are more appropriately controlled under a general permit than under individual permits.

*Id.* at § 2(a)(2)(A-E).

Obviously, determination of the issue revolves around a finding of "a relatively low risk for significant environmental impact." Certainly, this term is not a matter of lay interpretation but requires the expertise expected by the legislature and the courts to be prevalent in the DEP. Secondly, the language in a summary of a regulation is defined by the details of the regulation. In this case, the regulations spell out the five criteria authorizing the general permit. Included in that criteria is the legislature's authority to the Department to subjectively determine the most appropriate manner for controlling the source point discharge. Since it is not an error of law for the DEP to conclude, as a matter of fact, that the industry in question involves a relatively low risk

for significant environmental impact, the examination must be to determine whether there is substantial evidence to support the conclusion.

Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Application of a substantial evidence standard of review requires the reviewing court to "search the entire record . . . to determine whether on the basis of all the testimony and exhibits before the agency it could fairly and reasonably find the facts as it did." The fact that it is possible to draw "two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *In the Matter of Maine Clean Fuels, Inc.*, 310 A.2d 736 (Me. 1973). The evidence in this matter before the BEP is substantial and, to a large extent, highly technical. Interpretation of that technical information is a function of the BEP.

Further, any aquaculture facility seeking to comply with the Clean Water Act under the general permit must file a notice of intent with the DEP. Both the DEP and the EPA have the authority to deny a facility proceeding under the general permit. Regarding the argument that the BEP exceeded its authority when it considered the environmental impact after regulation rather than before, the rationale flies in the face of the statute and the regulation. Title 38 M.R.S.A. § 414-A mandates the DEP to issue a license for the discharge of a pollutant only if it finds that certain conditions exist, including, the limitations imposed by pollution abatement. Certainly, those conditions would become part of any permit and part of the consideration for approval. Secondly, the limitations on sources described by regulation pursuant to statute require findings, among other things, that the sources require the same effluent limitations, operating conditions or the same or similar monitoring. Obviously, these are conditions of a permit or license and would be post-regulation.

Pursuant to statute, the BEP may delineate "mixing zones" in waste discharge licenses.[3] 38 M.R.S.A. § 451. "The purpose of a mixing zone is to allow a reasonable opportunity for dilution, diffusion or mixture of pollutants with the receiving waters before the receiving waters below or surrounding a discharge will be tested for classification violations." *Id.* The permit at issue designated two mixing zones – a "Water Column Mixing Zone" and a "Sediment Mixing Zone." It is the creation of the sediment zone that petitioners assert is in excess of BEP's authority.

Briefly, the dilution purpose of a mixing zone, assert petitioners, cannot be served when the matter to be mixed is sediment (primarily fish feces and uneaten food) because sediment does not dilute or diffuse or, in essence, mix -- it just settles out and piles up at the bottom. Allowing creation of these fish middens is beyond the authority granted by the statute according to petitioners.

Respondent disagrees, asserting that the BEP is given broad authority to interpret water quality standards including its authority to create mixing zones. Respondent argues that the BEP has construed section 451 to include the bottom of the sea floor as part of the receiving waters in the mixing zone.

Petitioners argue that the mixing zone concept is an exception to the authority given to BEP in the statute. Citing a 1979 law Court ruling, *Wescott v. Allstate Ins.*, 397 A.2d 156, 169 (Me. 1979) petitioners urge the canon of construction that the expression of one thing is the exclusion of another in consideration of section 451. ("The maxim-*expressio unius est exclusio alterius* -- is well recognized in Maine as in other states. It is a handy tool to be used at times in ascertaining the intention of the lawmaking body.").

---

[3] These zones embody the adage that the solution to pollution is dilution.

*Id.* Petitioners close by maintaining that "[n]othing in the plain language of 38 M.R.S.A. § 451 anticipates the creation of waste piles on the sea floor."

Title 38 M.R.S.A. § 451 authorizes the Department to establish a mixing zone for any discharge. A specific definition of the mixing zone is not included but there are standards relating to its purpose, extent and limitations.

Whether the BEP has exceeded its statutory authority is an issue of statutory interpretation. When a statute or statutory scheme is unambiguous, this court must ascertain the intent of the legislature from the plain language. When there is ambiguity, the court will defer to the interpretation of a **statutory scheme** (emphasis supplied) by the agency charged with its implementation as long as the agency's construction is reasonable. A particular statute is not reviewed in isolation but in the context of the statutory and regulatory scheme. If the legislature's intent is not expressed unambiguously and the interpretation of the statutory scheme involves issues that are within the scope of the agency's expertise, the agency's interpretation must be given special deference. *Conservation Law Foundation, Inc., et al. v. DEP*, 823 A.2d 551 (2003).

Title 38 M.R.S.A. § 46(4)(F)(1) establishes the anti-degradation policy of the state to be enforced by the DEP and it mandates that the DEP must take into consideration:

> (c) Habitat, including significant wetlands, within a water body supporting existing populations of wildlife, aquatic, estuarine or marine life, or plant life that is maintained in the water body.

Title 38 M.R.S.A. § 465-B requires classification of waters that takes into account not only fishing but harvesting of shellfish and free flowing and natural habitat. Therefore, a sediment mixing zone is consistent with the statutory scheme.

The establishment of the sediment-mixing zone is consistent with federal guidance as evidenced by the concurrence of the EPA with the initial use of a 30-meter sediment-mixing zone in the present case. In addition, the court notes the substantial

monitoring and testing requirements provided as conditions of the permit and with highly specific standards for compliance.

Petitioners, citing a January 12, 2001 biological opinion written by the U.S. Fish and Wildlife Service and the National Marine Fisheries Service (NMFS), argue that the general permit's conditions are less protective than those required by the federal agencies. Petitioners cite an April 25, 2000 Memorandum of Agreement between DEP and the federal EPA governing permitting of "concentrated aquatic animal production facilities" pledging to carry out the permitting program "so as to protect endangered species (including the segment of the Atlantic Salmon, if listed) in accordance with the CWA." Petitioners also cite DEP regulations for the proposition that the State of Maine is committed to incorporate specific conditions into salmon farm permits determined by the federal services to be needed to protect Wild Salmon:

> If during the comment period the U.S. Fish and Wildlife Service, the National Marine Fisheries Service, or any other State or Federal agency with jurisdiction over fish, wildlife, or public health advises the Department in writing that the imposition of specified conditions upon the permit is necessary to avoid substantial impairment of fish, shellfish, or wildlife resources, the Department shall include the specified conditions in the permit to the extent they are determined necessary to carry out the provisions of 40 CFR 122.49 and of the CWA.

Code Me. R. 06—096-523 § 10(b).

Respondent answers petitioners' assertions regarding the Memorandum of Agreement cited above, by pointing out that neither U.S. Fish and Wildlife nor NMFS was a party to the agreement between Maine DEP and the federal EPA. Respondent points out that while EPA retains oversight authority when it delegates permit issuance authority under the CWA, it does not have authority to add or impose conditions that are not in the Clean Water Act. Citing *American Forest and Paper Association v. USEPA*, 137 F.3d 291, 298 (5th Cir. 1998) ("[t]here is no hint that Congress intended to grant EPA

authority to erect additional hurdles to the permitting process beyond those expressly noted in [the statute]").

The terms of the permit are clear that suggestions made to the BEP for protection of the native wild Atlantic Salmon are extensive and consistent with the requirements of the CWA. It is clear that to a large extent, the issue is not finally concluded. The EPA has approved the provisions of the permit as they exist but those conditions make it clear that there is a monitoring and continuing evaluation process to determine whether the conditions in compliance with the CWA protect the native stock. The permit specifically provides that the DEP, after public notice and opportunity for hearing, may modify the general permit to consider new information regarding the protection of Atlantic Salmon or relevant conditions that may be imposed by the U.S. Army Corps of Engineers. Annual reporting requirements are imposed. Effective July 31, 2004, all Atlantic Salmon placed in that pen must be of North American origin. Non-North American Atlantic Salmon must be removed from that pen prior to September 15, 2006. Both of these requirements call for confirmation with the DEP. There are specific requirements for a salmon farm to receive approval from the DEP if they are unable to meet the previous requirements in what is called an Alternate Compliance Plan.

Of course, a major issue is the implications of the Endangered Species Act. Title 16 U.S.C. Must protection of endangered species be a specific and enforceable provision of the general permit? The EPA has no authority to enforce the Endangered Species Act (ESA) under the Clean Water Act. *American Forest and Paper Association v. USEPA*, 137 F.3d at 299. The obligation on the DEP is to meet the objectives of the ESA in its enforcement of the CWA which provisions are in this general permit.

Petitioners cite the "Fourth Procedural Order" issued December 3, 2002, ruling that DEP staff would "serve as the applicant and will have the burden of proof," as violative of the plain language of the BEP's Special Regulations for Hearings on Applications of Significant Public Interest. Code Me. R. 06-096-30. Basically, petitioners object to the DEP rather than the persons who will be operating the fish farms depositing the waste in the ocean, serving as the applicant while at the same time continuing to serve as staff to the BEP. In these dual roles, petitioners point out that DEP "wrote the draft permit, wrote testimony in support of the permit and wrote the BEP response to Comments justifying the decision to approve the permit."

Petitioners cite to various provisions in the CMR that they assert show the clear intention that the applicant and the DEP will be separate entities. For example, provisions in the CMR require DEP to provide notice to the applicant, *id.* at § 3(A)(1), require applicant to disclose the nature and amount of discharge and the DEP must prepare an analysis, *id.* at § 7(A)(2) and applicants and DEP staff are, according to petitioners "assigned separate roles in providing testimony and cross-examination of witnesses. *Citing* § 11.[4]

Petitioners make the argument that this dual role puts DEP in a position of conflicted interest. Petitioners assert that this dual role for DEP caused petitioners actual injury or at the minimum, substantial prejudice. Citing *Town of Jay v. Androscoggin Energy, LLC*, 2003 ME 64, 882 A.2d 1114, 1117 (Me. 2003).

In *Town of Jay*, challenging the procedure used by BEP in conducting a hearing, the petitioner, Town of Jay, asserted "that the Board abused its discretion when it restricted prehearing discovery to a requirement that the parties file their expert

---

[4] While it is clear in section 11 that DEP and applicants are to question and cross separately and in a certain order, nothing in the regulation speaks to their role directly.

witnesses' testimony in writing prior to the hearing." *Id.* at ¶ 8. The Court stated that "[d]ue process at the agency level does not require full trial-like procedures." Citing *Fichter v. Bd. of Envtl. Prot.*, 604 A.2d 433, 437-38 (Me. 1992). Further the Court held:

> Moreover, "relaxation or modification of procedural rules by an administrative agency does not constitute reversible error absent a showing of injury or substantial prejudice.'" *In re Maine Clean Fuels, Inc.*, 310 A.2d 736, 744 (Me. 1973) (quoting *Sun Oil Co. v. Fed. Power Comm'n*, 256 F.2d 233, 239 (5th Cir. 1958), cert. denied, 358 U.S. 872, 3 L. Ed. 2d 103, 79 S. Ct. 111 (1958)). The Town has neither demonstrated any injury from the procedure used, nor shown that it has been substantially prejudiced by the Board's procedure. We find no abuse of discretion in the prehearing procedure employed by the Board.

*Town of Jay*, 2003, ME 64, ¶ 9, 882 A.2d at 1117. Petitioners assert that they have met the standard of showing "injury or substantial prejudice."

Petitioners also aver that the DEP's role as applicant spared the salmon farms, who petitioners call "the true applicants," from carrying the burden of proving that they should be allowed to discharge the pollutants at issue into coastal waters. Respondent answers petitioners' arguments by explaining that in a "general permit" situation there is no applicant in the traditional sense. The BEP therefore had to adjust the hearing process accordingly.

Respondent cites to the *Town of Jay* standard for showing abuse of discretion by the Board and asserts that petitioners have not shown "injury or substantial prejudice" and the procedure used did not result in a biased hearing process. Respondent quotes the *In re Maine Clean Fuels* decision for the proposition that "relaxation or modification of procedural rules by an administrative agency does not constitute reversible error absent a showing of injury or substantial prejudice.'" *In re Maine Clean Fuels, Inc.*, 310 A.2d at 744 (quoting *Sun Oil Co. v. Fed. Power Comm'n*, 256 F.2d 233, 239 (5th Cir. 1958). Respondent notes that the BEP subjected the full draft general permit to an adjudicatory

proceeding and argues that the BEP provided petitioners with more due process than was required, resulting in a fair unbiased process.

It is not uncommon for participants in the regulatory process in state government to question the role of staff in the regulatory agency in various proceedings. In the Public Utilities Commission, certain staff is designated as an advocate while others are assistants to the commissioners rendering decisions. In the Insurance Bureau, certain staff is designated as advocates while others are assistants to the commissioner. The designation of certain staff persons will change on a case-by-case basis. It is the responsibility of those staff persons to conduct themselves in a manner consistent with their responsibilities as assigned by the administrative supervisor.

The threshold issue for consideration in this case was whether the procedure was appropriate to the issues before it. Since the BEP is the rulemaking authority of the DEP, it was most appropriate for the DEP to request the BEP to consider the question and, if found to be appropriate, to conduct the proceedings for the issuance of the permit. Since the Department had the responsibility for enforcement of the permit, it was most appropriate for it to be an advocate for the issuance of a general permit. In this respect, the general permit is not unlike rulemaking and certainly not unlike the Department's Rule 13, the so-called permit-by-rule proceeding. In examining the entire record, the court can detect no undue prejudice, lack of due process or undue injuries suffered by any party to the proceeding. Indeed, given the significant history of federal-state regulatory exercise, in keeping with its highly technical expertise, the court is satisfied that the BEP has met the requirements under the law.

proceeding and argues that the BEP provided petitioners with more due process than was required, resulting in a fair unbiased process.

It is not uncommon for participants in the regulatory process in state government to question the role of staff in the regulatory agency in various proceedings. In the Public Utilities Commission, certain staff is designated as an advocate while others are assistants to the commissioners rendering decisions. In the Insurance Bureau, certain staff is designated as advocates while others are assistants to the commissioner. The designation of certain staff persons will change on a case-by-case basis. It is the responsibility of those staff persons to conduct themselves in a manner consistent with their responsibilities as assigned by the administrative supervisor.

The threshold issue for consideration in this case was whether the procedure was appropriate to the issues before it. Since the BEP is the rulemaking authority of the DEP, it was most appropriate for the DEP to request the BEP to consider the question and, if found to be appropriate, to conduct the proceedings for the issuance of the permit. Since the Department had the responsibility for enforcement of the permit, it was most appropriate for it to be an advocate for the issuance of a general permit. In this respect, the general permit is not unlike rulemaking and certainly not unlike the Department's Rule 13, the so-called permit-by-rule proceeding. In examining the entire record, the court can detect no undue prejudice, lack of due process or undue injuries suffered by any party to the proceeding. Indeed, given the significant history of federal-state regulatory exercise, in keeping with its highly technical expertise, the court is satisfied that the BEP has met the requirements under the law.

The entry will be:

The approval of the Board of Environmental Protection of an Atlantic Salmon Aquaculture General Permit, No. MEG130000 is AFFIRMED.

Dated: August 26, 2004

Donald H. Marden
Justice, Superior Court

Date Filed __7/9/03__ __Kennebec__ Docket No. __AP03-43__
                                    County

Action __Petition for Review__                    **J. MARDEN**
              80C
                                   Jon Edwards, AAG      (DEP)
                                   6 State House Station
                                   Augusta, Maine  04333-0006

                                    ─Elizabeth Butler, Esq.
                                      Stolt Sea Farm, Inc.; Inernationa
                                      Aquafoods, USA, Inc. and D.E.
                                      Salmon, Inc.
__United State Public Interest Research__   vs. __The Board of Environmental Protection__

| Plaintiff's Attorney       Group, et al | Defendant's Attorney |
|---|---|
| Bruce M. Merrill, Esq. 225 Commercial Street, Suite 401 Portland, Maine  04101  Joseph Mann Esq 44 Winter St Boston MA  02108 | ─ Jeffrey A. Thaler, Esq. (Atlantic Salmo 100 Middle St., West Tower P.O. Box 9729 Portland, Maine  04104-5029 ─ Nicholas s. Nadzo, Esq. (Heritage Salmo Ten Free Street P.O. Box 4510 Portland, Maine  04112 Michael A. Nelson, Esq. |

| Date of Entry | |
|---|---|
| 7/9/03 | Petition for Judicial Review, filed. s/Merrill, Esq. |
| 7/21/03 | Amended Petition for Judicial Review Pursuant to M.R.CIV.P. 80C, filed. s/Merrill, Esq. |
| 7/24/03 | Letter informing the court that Atlantice Salmon of Maine, LLC wished to participate in the Appeal, filed. s/Thaler, Esq. |
| | Consented-to Motion to Intervene and Incorporated Memorandum of Law, filec s/Thaler, Esq. Proposed Order, filed. |
| | Notice of Appearance for Heritage Salmon, Inc, filed. s/Nadzo, Esq. |
| 7/28/03 | ORDER, filed.  s/Marden, J. ORDERED that the Motion to Intervene is Granted.  Atlantic Salmon of Mai LLC is granted intervenor status as a party-respondent in this case.  Cc issued to counsel of record. |
| 7/28/03 | Entry of Appearance for Stolt Sea Farm, Inc.; International Aquafoods, USA Inc. and D.E. Salmon, Inc, filed.  s/Elizabeth Butler, Esq. |
| 8/8/03 | Certification of Record, filed. s/Edwards, AAG Index to Record, filed.    **(in vault)** |
| ─────── | Notice of briefing schedule mailed to attys of record. |
| 8/14/03 | Motion for Admission of Visiting Attorneys Pursuant to M.R.Civ.P. 89(b), filed. s/Merrill, Esq. |
| 8/29/03 | Additional pages, filed. s/Edwards, AAG |
| 9/17/03 | Brief of Petitioners/Plaintiffs in Support of Petition for Review of Salmo Aquaculture General Permit, filed. s/Merrill, Esq. |
| 9/25/03 | Copy of Letter filed. s/Merrill, Esq. |
| 10/3/03 | Copy of letter from Atty. Merrill, filed. s/Merrill, Esq. |